UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------------X

RAFFIQUE KHAN,                                                    Docket No.
                                        Plaintiff,               24-CV-2168
                                                                 (ARR) (JAM)
            -- against --

NEW YORK CITY, ERIC L. ADAMS. Mayor, New York City, in
his official capacity; NEW YORK CITY POLICE DEPARTMENT
(NYPD); EDWARD A. CABAN,, Police Commissioner, in his official
capacity; MICHAEL GERBER, Deputy Commissioner of Legal
Matters (DCLM), in his official capacity; INSPECTOR ROHAN
GRIFFITH, Commanding Officer, 75th Precinct, in his official
capacity; NYPD OFFICER MATTHEW S. BESSEN, Shield No.
14934; NYPD OFFICER NOAH NICHOLSON, Shield No.
undisclosed by NYC at this time; NYPD SERGEANT PATRICK
HUGHES, Shield No. undisclosed by NYC at this time; NYPD
OFFICER JOSEPH JACOBSEN, Shield No. undisclosed by NYC
at this time; NYPD OFFICER THOMAS COSTIGAN, Shield No.
undisclosed by NYC at this time; NYPD OFFICER JEISON JARA,
Shield No. undisclosed by NYC at this time; NYPD OFFICER
MOHAMED ELDIASTY, Shield No. undisclosed by NYC at this
time; NYPD OFFICER JOSEPH ASTARITA, Shield No. 6964; and
NYPD employees JOHN and JANE DOES No. 1-10, of "DG_LIC-
Incidents," "DG_LIC-Hearings-Appeals" involved in refusing to
return the firearms unlawfully seized from Raffique N. Khan,
and/or defacing said firearm and magazine,
                                        Defendants.

------------------------------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO THE
DEFENDANTS' MOTION TO DISMISS**

TODD D. GREENBERG                        JONATHAN I. EDELSTEIN
ADDABBO & GREENBERG                      EDELSTEIN & GROSSMAN
118-21 Queens Blvd., Suite 306           501 Fifth Avenue, Suite 514
Forest Hills, NY 11375                   New York, NY 10017
(718) 268-0400                           (212) 871-0571
todd@queenslaw.com                       jonathan.edelstein.2@gmail.com

                        *Counsel for Plaintiff*

# TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

Preliminary Statement ............................................................................................................. 1

Allegations of the Second Amended Complaint ..................................................................... 1

Standard of Review .................................................................................................................. 6

Argument……… ...................................................................................................................... 8

      POINT I

      THE SAC STATES A CLAIM FOR VIOLATION OF EQUAL
      PROTECTION (ANSWERING POINT I OF THE MOTION TO
      DISMISS) .................................................................................................................... 8

      POINT II

      THE COMPLAINT STATES A CLAIM FOR MUNICIPAL
      LIABILITY (ANSWERING POINT II OF THE MOTION TO
      DISMISS) .................................................................................................................... 9

      POINT III

      THE SAC STATES A CLAIM AGAINST SERGEANT HUGHES
      (ANSWERING POINT V OF THE MOTION TO DISMISS) ........................................ 12

      POINT IV

      THE SAC STATES A CLAIM AGAINST DEFENDANTS
      ASTARITA, NICHOLSON, JACOBSEN, COSTIGAN, JARA,
      AND ELDIASTY (ANSWERING POINT IV OF THE MOTION
      TO DISMISS) .............................................................................................................. 14

      POINT V

      AT MINIMUM, LEAVE TO REPLEAD ANY DISMISSED
      CAUSES OF ACTION SHOULD BE GRANTED ....................................................... 18

Conclusion……….. ................................................................................................................. 19

i

# TABLE OF AUTHORITIES

**Cases:**

Amnesty America v. Town of West Hartford, 361 F.3d 113 (2d Cir. 2004)...................................9

Anderson v. Branen, 17 F.3d 552 (2d Cir. 1994) ................................................12,14

Anderson News, LLC v. American Media, Inc., 680 F.3d 162 (2d Cir. 2012) ...........................6,7

Antonyuk v. James, 120 F.4th 941 (2d Cir. 2024)..........................................17

Arista Records, LLC v. Doe 3, 604 F.3d 110 (2d Cir. 2010) ...........................................8

Ashcroft v. al-Kidd, 563 U.S. 730 (2011)..................................................16

Ashcroft v. Iqbal, 556 U.S. 662 (2009)...................................6,6n,7,8,9,12

Bailey v. City of New York, 79 F. Supp. 3d 424 (E.D.N.Y. 2015)...............................16

Barzee v. Abdulla, 2024 WL 4836870 (S.D.N.Y. 2024)...................................12,13,14

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).................................6,6n,7,9,12

Cameron v. City of New York, 598 F.3d 60 (2d Cir. 2010)...........................................15

Campanella v. County of Monroe, 2012 WL 537495 (W.D.N.Y. 2012) ........................................8

Citizens United v. Schneiderman, 882 F.3d 374 (2d Cir. 2018)....................................6,7

District of Columbia v. Heller, 554 U.S. 570 (2008)................................................16,17

Dougherty v. Town of North Hempstead, 282 F.3d 83 (2d Cir. 2002) ...........................................8

Felmine v. City of New York, 2011 WL 4543268 (E.D.N.Y. 2011) ...........................................16

Ferrari v. County of Suffolk, 790 F. Supp. 2d 34 (E.D.N.Y. 2011) .............................................10

Gonzalez Rodriguez v. Walmart, Inc., 2023 WL 2664134 (S.D.N.Y. 2023)..................................7

Grandstaff v. City of Borger, 767 F.2d 261 (5th Cir. 1985) ...........................................11

Hayden v. County of Nassau, 180 F.3d 42 (2d Cir. 1999) .............................................16

Hu v. City of New York, 927 F.3d 81 (2d Cir. 2019)...................................................7

Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501 (S.D.N.Y. 2008) ................................................13

Jennings v. City of New York, 2023 WL 2307432 (S.D.N.Y. 2023)...........................................18

Johnson v. City of Shelby, Miss., 574 U.S. 10 (2014) ...................................................................7

Leatherman v. Tarrant County Narcotics Intel. & Coord. Unit, 507 U.S. 163 (1993) ................7,9

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo., 797 F.3d 160 (2d Cir. 2015) ...........................18

Lucas v. New York City, 842 F. Supp. 101 (S.D.N.Y. 1994) ...................................................11,12

Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010) ...................................................15

McCagg v. Marquis Jet Partners, Inc., 2007 U.S. Dist. LEXIS 54516 (S.D.N.Y. 2007) ...............7

McDonald v. City of Chicago, 561 U.S. 742 (2010) .....................................................................17

Michael v. County of Nassau, 2010 WL 3237143 (E.D.N.Y. 2010)..............................................10

New York Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022)................................................17

Parker v. Raging Capital Mgmt., LLC, 105 F.4th 46 (2d Cir. 2024).............................................1

People v. Smith, 181 A.D.2d 802 (2d Dept. 1992)..........................................................................9

Reyes v. County of Suffolk, 995 F. Supp. 2d 215 (E.D.N.Y. 2014) ..............................................10

Selevan v. New York State Thruway Auth., 584 F.3d 82 (2d Cir. 2009).........................................7

Sorlucco v. New York City Police Dep't, 971 F.2d 864 (2d Cir. 1992).........................................12

TechnoMarine SA v. Giftports, Inc., 758 F.3d 493 (2d Cir. 2014) ...............................................18

Terebesi v. Torreso, 764 F.3d 217 (2d Cir. 2014) ........................................................................13

Thomas v. City of Troy, 293 F. Supp. 2d 282 (N.D.N.Y. 2018)...................................................13

Zellner v. Summerlin, 494 F.3d 344 (2d Cir. 2007) ......................................................................16

**Statutes and Rules:**

Fed. R. Civ. P. 12 ...........................................................................................................................7

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff RAFFIQUE N. KHAN, by and through the undersigned counsel, respectfully submits this Memorandum of Law in opposition to the defendants' motion to dismiss certain causes of action in the Second Amended Complaint.

As will be discussed below, plaintiff does not oppose Points III, VI, and VII of the defendants' motion, and therefore does not oppose dismissal of (1) his official-capacity claims; (2) the causes of action for conspiracy; and (3) the claim for appointment of a monitor. However, as to all other claims, the defendants' motion should be denied.

<u>**ALLEGATIONS OF THE SECOND AMENDED COMPLAINT**</u>

As alleged in the Second Amended Complaint ("SAC") (ECF Doc. 48), which must be accepted as true for purposes of this motion, see <u>Parker v. Raging Capital Mgmt., LLC</u>, 105 F.4th 46, 51 (2d Cir. 2024), plaintiff Raffique N. Khan is a United States citizen and Army veteran who retired with the rank of Staff Sergeant after being injured in an insurgent attack on FOB Salerno in Afghanistan on June 1, 2012. (SAC, ¶ 7). Khan was awarded the Bronze Star and Purple Heart as a result of this incident, with the Bronze Star citation stating as follows:

> After a Suicide Vehicle Borne Improvised Explosive Device destroyed the DFAC where he and his team were eating, SGT Khan extracted trapped personnel from the wreckage and initiated first aid on the wounded. He engaged advancing insurgents with M16 fire, and continued to provide security at an impromptu casualty collection point until the attack was defeated and the casualties evacuated. For his heroic actions, SGT Khan was awarded the Bronze Star Medal for Valor.

(Id., ¶ 7 and Exhibits 2-3).

Khan is a person of color who was born in Trinidad and Tobago and became an American citizen by virtue of his service in the United States military. (Id., ¶ 142).

On April 11, 2023, the NYPD issued Khan a restricted handgun license to keep a firearm

in his residential premises. (Id., ¶ 8 and Exhibit 5(a)). Thereafter, on September 1, 2023, the NYPD issued Khan an unrestricted concealed carry handgun license. (Id., ¶ 10 and Exhibit 5(b)). Both of these licenses remained in full force and effect at all times relevant to the action. (Id., ¶¶ 9, 11). Furthermore, on September 13, 2023, the NYPD issued a Handgun Purchase Authorization to Khan, pursuant to which he purchased a Smith & Wesson "Equalizer" handgun, SKU # PJH2036, which was similar to the gun he had used during his Army service. (Id., ¶¶ 12-13 and Exhibits 5(c) and 6). Khan further completed an18-hour concealed carry training course for which he was issued a certificate by Woodhaven Rifle & Pistol Range. (Id., ¶ 14 and Exhibit 7).

Khan is presently employed by the United States Department of the Interior National Park Service at the Gateway National Recreational Area in Staten Island as an Environmental Protection Specialist, and has carried his handgun pursuant to the license issued to him since the date it was purchased. (Id., ¶ 15).

On November 26, 2023, Khan was attending a small private function with family and friends commemorating what would have been his mother's 70th birthday had she not recently passed away. (Id., ¶ 66). Khan, his cousin, and a friend took some food from the function and sat in Khan's car to eat and talk. (Id., ¶ 67). The car was a 2022 BMW Series 3 owned by Khan and bearing Purple Heart license plates. (Id., ¶ 68).

About 3:15 a.m., an unmarked police vehicle containing defendants, NYPD Officer Matthew Bessen and NYPD Officer Noah Nicholson, drove past Khan's car, slowed down, and drove on. (Id., ¶¶ 68-69). A short time later, Khan drove off with his cousin and friend toward his home in St. Albans, Queens. (Id., ¶ 70). Soon after beginning to drive, Khan was stopped by the same unmarked police car he had observed earlier. (Id., ¶ 71). There was no basis for the stop and no probable cause other than that Khan was a person of color driving a late-model car, and at the

time of the stop, he was not charged with any traffic violation. (Id., ¶¶ 145-46).

The officers in the car were, upon information and belief, defendants Bessen and Nicholson, but were not in uniform and did not identify themselves. (Id., ¶¶ 71-72). Also at the scene of the stop were defendants Sergeant Patrick Hughes, Officer Joseph Jacobsen, and Officer Thomas Costigan. (Id., ¶ 80).

Khan immediately told Bessen that he had a weapon in the glovebox and that the licenses were in the sun visor of the car, where he always keeps them. (Id., ¶¶ 73-74). Without any explanation, however, Bessen told Khan to step out of the vehicle. (Id., ¶ 75). The officers then searched the vehicle without consent and, after about 30 minutes, handcuffed Khan, his cousin, and his friend. (Id., ¶ 75). Bessen observed Khan's concealed carry license and retired military ID and asked "how did you get these?" but did not listen to Khan's answer. (Id., ¶ 77).

Khan was then arrested, taken to the 75th Precinct, and put in a holding cell. (Id., ¶¶ 79-80). Defendants Officer Jeison Jara and Officer Mohamed Eldiasty were officers at the precinct who participated in the arrest, processing, and/or incarceration of Khan and who knew or should have known that there was no legal basis for the arrest of Khan. (Id., ¶¶ 49-54).

Khan remained in custody without opportunity to communicate until approximately 3 p.m. on November 27, 2023, when he finally made arraignment. (Id., ¶¶ 81-91). At that time he was released without bond after having been incarcerated and held incommunicado for more than 34 hours from the time of his arrest. (Id., ¶¶ 93-94).

On the same date, November 27, 2023, Khan called the NYPD Licensing Division and was advised to turn in the aforesaid Smith & Wesson weapon for safekeeping. (Id., ¶ 98). He also attempted to retrieve the personal property that had been taken at the time of his arrest but, as described in the complaint, was given a runaround, told to go to different locations at different

times, and then to return to the same location as before, recovering the bulk of his property only on December 1, 2023 and his cell phone on January 11, 2024. (Id., ¶¶ 99-111).

On December 1, 2021, the Manhattan District Attorney requested more time to verify that Khan had a valid and active concealed carry license. (Id., ¶ 113). On February 23, 2023, after conducting such verification, the District Attorney's office formally dismissed the charges against Khan, specifically noting that "defendant is a federal officer working on an Army base and has an active carry and conceal license." (Id., ¶ 114, 123 and Exhibit 12).

Despite the dismissal of Khan's criminal charges, he faced a continued odyssey in obtaining the return of his firearm. (Id., ¶¶ 116-22). He repeatedly advised the NYPD that the charges had been dropped and that the District Attorney's office had signed a release but was continually delayed and told that further investigation was required. (Id.) As of March 25, 2024, he still had not received the firearm back despite attorney intervention. (Id., ¶¶ 121-22).

The officer who interacted with Khan at the NYPD Licensing Division was defendant Officer Joseph Astarita, who after a number of frustrating email exchanges, advised Khan on March 14, 2024 that Khan might not be aware of the relevant process and that Astarita, personally, had to finish an investigation before his supervisors could make a determination. (Id., ¶¶ 123-28 and Exhibit 12). Astarita promised to complete his investigation "by midweek next week." (Id., ¶ 128 and Exhibit 12). However, despite the District Attorney's office executing a release on the same date, Khan did not get his firearm back either then or by midweek the next week. (Id., ¶¶ 129-30). Only after again contacting Astarita on April 2, 2024 did Khan receive his firearm back on April 3, 2024. (Id., ¶¶ 131-38).

The return of Khan's firearm, however, proved not to be the end of the matter, as the firearm had been damaged in custody, namely by engraving numerals thereon in place of the

original serial number. (Id., ¶¶ 139-41). This renders the firearm a defaced firearm which is unlawful to carry.

As a result of the above events, Khan's Second Amended Complaint alleges six causes of action: (1) violation of Khan's equal protection rights in that he was prosecuted due to his race, color, and/or national origin (id., ¶¶ 142-54); (2) denial of Second Amendment rights (id., ¶¶ 155-65); (3) municipal liability (id., ¶¶ 166-73); (4) false arrest and false imprisonment (id., ¶¶ 174-81); (5) conspiracy against civil rights (id., ¶¶ 182-90); and (6) appointment of a monitor (id., ¶¶ 191-200).

In support of the municipal liability claim, Khan alleged in pertinent part as follows:

> Starting with the initial baseless traffic stop of Plaintiff Raffique N. Khan, a gentleman of color apparently for no other reason than he was a person of color driving a relatively new BMW through Brooklyn in the domain of the NYPD 75th Precinct, "driving while black," and then the pretextual arrest for possession of a handgun when the Concealed Carry License issued to SSgt Khan was clearly visible to the arresting officer, Defendant NYPD Officer Matthew Bessen and all the other Defendant NYPD Officers present at the scene, on the windshield sun visor; followed by the indignity of booking, imprisonment, and arraignment, only to have the case summarily dismissed with the charges withdrawn, Plaintiff Raffique N. Khan was clearly a victim of long standing policy and practices of the NYPD of attempting to limit, restrict, and where possible prohibit, possession of a handgun by persons of color in New York City, since the command and management of the 75th Precinct were fully aware that SSgt Khan was a wounded American combat veteran with a Bronze Star for Valor and a Purple Heart and had a valid concealed carry handgun license.

(Id., ¶ 167). Khan further alleged that his stop and arrest, and the seizure of his firearms and defacing them, were separate constitutional violations that evinced such pattern or practice. (Id., ¶ 170). Furthermore, the defendants knew or should have known that the mere ownership of a firearm was no longer probable cause for an arrest, and that "the continuation of Defendants' policy to arrest those who merely possess a firearm is a constitutional violation evidencing a custom and

policy of the Defendants, jointly and/or severally, individually, and/or collectively, to violate the Second Amendment rights of the Plaintiff Raffique N. Khan and other persons of color." (Id., ¶ 171).

Now, by motion served on February 4, 2024, defendants move to dismiss the equal protection claim, all official-capacity claims, all claims for municipal liability, the claims against all individual defendants other than Officer Bessen, the conspiracy claims, and the claim for appointment of a monitor. Defendants **do not** seek dismissal of the Second Amendment and false arrest/false imprisonment claims against Bessen.

Plaintiff does not oppose dismissal of the official-capacity claims, the conspiracy claims, and the claim for appointment of a monitor, and thus consents to the defendants' motion being granted as to those claims. However, under the stringent standard applicable to motions to dismiss at the pleading stage, defendants are not entitled to the remainder of the relief sought.

## STANDARD OF REVIEW

a complaint will survive a motion to dismiss on the pleadings if it includes "enough facts to state a claim to relief that is plausible on its face," that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009);[1] see generally Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018). In determining whether a complaint states a claim that is plausible, however, the court is required to proceed "on the assumption that all the factual allegations in the complaint are true, even if their truth seems doubtful." Anderson News, LLC v. American Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012), quoting Twombly, 550

---

[1] The Iqbal Court made clear that the Twombly pleading standard applied to all federal civil cases and not merely to antitrust actions, but did not impose any standard greater than that specified in Twombly. See Iqbal, 556 U.S. at 678.

U.S. at 555. "Given that the plausibility requirement *does not impose a probability requirement at the pleading stage*… a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of facts alleged is improbable." Anderson News, 680 F.3d at 185 (emphasis added), quoting Twombly, 550 U.S. at 556; see also Citizens United, 882 F.3d at 380. Indeed, dismissal must be denied even if it seems to this Court "that a recovery is very remote and unlikely." Hu v. City of New York, 927 F.3d 81, 97 (2d Cir. 2019).

The Twombly/Iqbal standard also "*do[es] not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.*" Hu, 927 F.3d at 97 (emphasis in original), quoting Twombly, 550 U.S. at 570. Moreover, post-Twombly and Iqbal, the Supreme Court has "emphatically reaffirmed" its decision in Leatherman v. Tarrant County Narcotics Intel. & Coord. Unit, 507 U.S. 163, 168 (1993), which rejected a heightened pleading standard for Section 1983 cases in general, including for claims of municipal liability. See Johnson v. City of Shelby, Miss., 574 U.S. 10, 11 (2014) (reaffirming that Leatherman remains good law). The standard of Twombly thus "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" supporting the claim. Id. Ultimately, this standard is addressed to whether the facts as alleged in the complaint "make[] ... sense." McCagg v. Marquis Jet Partners, Inc., 2007 U.S. Dist. LEXIS 54516, *7 (S.D.N.Y. 2007).

In adjudicating a Rule 12(b)(6) motion under the Twombly/Iqbal standard, the Court must "construe [the] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." Selevan v. New York State Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009); see also Gonzalez Rodriguez v. Walmart, Inc., 2023 WL 2664134, *2 (S.D.N.Y. 2023) (same). This rule of construction extends to facts pled upon information and belief where those facts are "peculiarly within the possession and control of the defendant, or

where the belief is based on factual information that makes the inference of culpability plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). Moreover, the court must be cognizant that specific evidence of a defendant's mental state – e.g., intent, motive and/or knowledge – is rarely available to the plaintiffs at the pre-discovery stage, and thus need not be pled with full specificity. See Dougherty v. Town of North Hempstead Board of Zoning Appeals, 282 F.3d 83, 91 (2d Cir. 2002); accord Campanella v. County of Monroe, 2012 WL 537495, *7 (W.D.N.Y. 2012) (applying the same standard post-Iqbal).

## POINT I

### THE SAC STATES A CLAIM FOR VIOLATION OF EQUAL PROTECTION (ANSWERING POINT I OF THE MOTION TO DISMISS)

Plaintiff first submits that the SAC plausibly states a claim for equal protection. Defendants contend that because the SAC does not plead incidents in which white motorists and/or firearm owners were treated differently from Khan – incidents which it would likely be impossible for plaintiff to learn of without discovery – then it does not state a plausible claim for relief. But this is not so, because the equal protection violation can be inferred from the very conduct at issue in this case.

As discussed above, the SAC alleges that Khan is a person of color, a dark-skinned Trinidadian, and that he was sitting in a late-model BMW talking to his cousin and their friend. The SAC further alleges that, prior to making the stop, defendants Bessen and Nicholson slowed their unmarked car and passed by. The only things Bessen and Nicholson could have learned about Khan at the time were precisely that he was a person of color sitting with other persons of color in a late-model car. Then, according to the SAC, Bessen and Nicholson conducted a traffic stop a short time later. There are no allegations in the SAC that they learned of additional information

between the initial observation and the stop. Thus, drawing reasonable inferences in favor of plaintiff as this Court must do on a motion to dismiss, it may be inferred, in the absence of any other reason for stopping Khan's car, that Bessen and Nicholson did so on the basis of the only reason they did have, i.e., Khan's race, color and/or national origin.

Also, the SAC alleges that Khan was not issued any traffic tickets as a result of the stop. A traffic stop made without observation of a bona fide traffic violation and without issuance of traffic tickets is a classic indicia of a "pretext stop." See, e.g., People v. Smith, 181 A.D.2d 802, 803 (2d Dept. 1992) (finding stop pretextual where, *inter alia*, "the police did not bother to give the cab driver a summons, or even ask to see his license or registration"). This, too, may therefore support an inference that Bessen and Nicholson's decision to stop Khan's vehicle was not predicated on some legitimate reason but instead solely on Khan's race and possession of a late-model car, which was all the information available to them at the time. This Court should thus find that dismissal of the equal protection claim is premature.

### POINT II

### THE COMPLAINT STATES A CLAIM FOR MUNICIPAL LIABILITY (ANSWERING POINT II OF THE MOTION TO DISMISS)

This Court also should not dismiss the municipal liability claim. Where a Monell-type claim is at issue, this Court must also be cognizant that neither Twombly nor Iqbal purported to overrule Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993), which held that civil rights actions alleging municipal liability are not subject to a heightened pleading standard. The courts recognize that a Monell claim must be pled without the benefit of discovery. See Amnesty America v. Town of West Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004). Thus, even in the wake of Twombly and Iqbal, numerous courts have continued

to hold that civil rights plaintiffs need not plead more than one incident in order to render it plausible that a municipal custom, practice and/or policy might exist, but must simply identify the policy or custom in question with specificity. See, e.g., Michael v. County of Nassau, 2010 WL 3237143, *4 n.2 (E.D.N.Y. 2010); Ferrari v. County of Suffolk, 790 F. Supp. 2d 34, 45-46 (E.D.N.Y. 2011); Reyes v. County of Suffolk, 995 F. Supp. 2d 215, 231 (E.D.N.Y. 2014).

In this case, the SAC does identify the custom, policy and/or practice with specificity: namely, that it was the custom within the NYPD to stop and detain persons of color who are "driving while black" in late-model automobiles and, if such persons of color are found with firearms, to arrest, incarcerate and prosecute them and to obstruct the return of their firearms even if those firearms are lawfully owned and carried. The S&C identifies, in essence, a policy, practice and custom of violating the Second and Fourth Amendment rights of firearm owners of color. This is a specific, not a vague or conclusory, allegation.

Notably, defendants do not dispute that the SAC pleads sufficient facts to allege that a Second and Fourth Amendment violation did occur in this case, as they do not seek dismissal of the Second Amendment claim and false arrest/false imprisonment claim as against Bessen. Their argument is addressed entirely to whether the SAC contains enough supporting facts for a *custom* of such violations to be inferred. Contrary to their contention, it does.

To begin with, defendants wrongly characterize Khan's Monell claim as being based on a single incident, but it is not. Instead, as made clear at paragraph 170 of the SAC, the claim arises from a *series* of incidents – the initial stop, the seizure and arrest of Khan, the seizure and retention of Khan's firearm, and the defacement of the firearm – *each* constitutes an independent constitutional violation undertaken pursuant to the policy. A series of acts occurring over a period of time, even within the confines of one case, can support an inference of a municipal policy. See

Grandstaff v. City of Borger, 767 F.2d 261, 271 (5th Cir. 1985) (finding that "repeated acts of abuse of [Grandstaff's constitutional] right[s], by several officers in several episodes," were sufficient to infer the existence of a municipal custom or practice). Thus, although under the above-cited authorities, Khan need do no mote than plead a single incident and identify a specific policy that gave rise to it, he *has* done more – he pled a continuing series of incidents which, linked together, suggest that the custom or practice alleged in the SAC still exists.

Additionally, the SAC alleges that five (5) officers – Bessen, Hughes, Nicholson, Jacobsen and Costigan – were present at the time of the stop and arrest. It may be inferred that these officers, one of whom, Hughes, was a sergeant, were all in a position to hear what Khan said about his firearm and permit, to observe the unrestricted concealed carry permit itself, and thus to recognize that there was no basis to arrest Khan. Likewise, the SAC alleges that two other officers, Jara and Eldiasty, were at the precinct and took part in the arrest processing, and presumably, drawing reasonable inferences from this allegation, that they were in a position to see and voucher the property taken from Khan including his concealed carry permit. Nevertheless, as alleged in the SAC, each of these seven (7) officers proceeded to actively participate in the search, seizure, arrest, and incarceration complained of, and none of them, including Sergeant Hughes, demurred or intervened.

It has been held that "from the presence of a considerable number of police, all of whom act in similar fashion, it may be reasonable for a trier of fact to infer that they were trained to act that way." Lucas v. New York City, 842 F. Supp. 101, 103 (S.D.N.Y. 1994). Thus, the fact that seven (7) separate officers were involved in the stop, search, and arrest, with none of them demurring *despite being in a position to see that Khan had a valid, unrestricted carry permit for the very firearm he had with him*, is also a fact from which the existence of a municipal policy,

custom and/or practice may be inferred.  Moreover, the <u>Lucas</u> court also noted that an "unusually…

egregious" constitutional violation may be "sufficiently out of the ordinary," even if unique, to

"indicate that it was attributable to inadequate training or supervision." <u>Id.</u>, <u>citing</u> <u>Sorlucco v. New</u>

<u>York City Police Dep't</u>, 971 F.2d 864, 873 (2d Cir. 1992).  Here, again, the blatant and egregious

act of arresting and incarcerating Khan and confiscating his firearm *even after being shown a valid,*

*active concealed carry license* – especially with a supervisor being actually present and in a

position to intervene – evinces such a blatant and outrageous disregard for Khan's rights that it

could plausibly be attributed to deliberately indifferent failure to train.

Accordingly, contrary to defendants' contention, the allegations in the SAC supporting

Khan's claim of municipal liability are sufficient to establish a plausible claim to relief, and thus

satisfy the <u>Twombly</u>/<u>Iqbal</u> standard. Defendants are not entitled to dismissal of this claim on the

pleadings.

## POINT III

### THE SAC STATES A CLAIM AGAINST SERGEANT HUGHES (ANSWERING POINT V OF THE MOTION TO DISMISS)

Third, the SAC sufficiently alleges a claim against Sergeant Hughes.  Defendants argue for

dismissal on the basis that a claim against Sergeant Hughes must be based on "his own individual

actions" rather than simply by virtue of his position as supervisor.  But in fact, Khan's claim against

Sergeant Hughes *is* based on Hughes's "individual actions," namely failure to intervene.

It is well settled that "law enforcement officials have an affirmative duty to intervene to

protect the constitutional rights of citizens from infringement by other law enforcement officers in

their presence." <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994); <u>Barzee v. Abdulla</u>, 2024

WL 4836870, *6 (S.D.N.Y. 2024).  Defendants also correctly state that a failure to intervene claim

has four prongs, namely (i) that a constitutional violation was committed against the plaintiff; (ii) that the defendant officer knew or deliberately ignored the fact that a constitutional violation was going to be, or was being, committed; (iii) that the defendant officer had a reasonable opportunity to intervene and prevent the harm; and (iv) that the defendant did not take reasonable steps to intervene. See Barzee, supra; see also Thomas v. City of Troy, 293 F. Supp. 2d 282, 296 (N.D.N.Y. 2018); see also Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" Terebesi v. Torreso, 764 F.3d 217, 244 (2d Cir. 2014).

In this case, again, it is undisputed, given that defendants have not moved to dismiss the Second Amendment and false arrest/imprisonment claims, that the SAC states a constitutional violation. Moreover, the SAC alleges that Hughes was physically present at the scene where Khan was stopped, detained, handcuffed, searched, and arrested, and further alleges that the search lasted approximately 30 minutes and that during the course thereof, the officers at the scene observed and recovered Khan's unrestricted concealed carry permit. Drawing reasonable inferences in Khan's favor as must be done at the pleading stage, it may thus be inferred that Hughes, who was physically present during a stop and search taking place in a small area, learned of the carry permit and/or was able to observe it for himself, and was thus on notice that there was no basis to arrest Khan or seize his firearm. It may also be inferred that, due to the 30-minute duration of the incident, there was ample time for Hughes, using his authority as sergeant, to intervene and stop the unconstitutional seizure and arrest from occurring. And the SAC also makes clear that Hughes took no steps to intervene and in fact actively participated in and signed off on the arrest.

Consequently, rather than being "speculative" as defendants allege, the claim against

Hughes in the SAC is supported by specific allegations of fact plausibly establishing all four elements of a failure-to-intervene claim. Defendants are therefore not entitled to dismissal of the Second and Fourth Amendment claims as against Hughes.

**POINT IV**

**THE SAC STATES A CLAIM AGAINST DEFENDANTS ASTARITA, NICHOLSON, JACOBSEN, COSTIGAN, JARA, AND ELDIASTY (ANSWERING POINT IV OF THE MOTION TO DISMISS)**

Nor are defendants entitled to dismissal against the remaining individual defendants, who may be divided into three groups.

The first group – Nicholson, Jacobsen, and Costigan – are, like Hughes, alleged to have been physically present at the scene where Khan was stopped, searched, handcuffed, and arrested. Moreover, Nicholson is alleged in the SAC not only to have been present in the stop but to have been in the unmarked police car with Bessen at the time they originally slowed down and passed Khan's vehicle and at the time the decision to conduct a traffic stop of Khan was made. The claim against these defendants is precisely the same as that against Hughes: namely, that although physically present and in a position to observe and intervene during an incident that unfolded over 30 minutes, they failed to take any steps to prevent the constitutional violations against Khan. Nicholson was also present *before* the stop and in a position to see that there was no basis to conduct the stop at all, but again, failed to take any steps to intervene and prevent Bessen from conducting the stop. Moreover, each of these defendants, working together as a team, actively participated in the search, seizure and arrest complained of. Thus, under the authorities cited in Point III above, the SAC states a plausible claim for relief against them. See Anderson, supra; Barzee, supra.

The second group consists of Officers Jara and Eldiasty, who as stated above are alleged

14

to have been at the precinct after Khan was brought in and to have participated in his processing and incarceration. Again, drawing all reasonable inferences in favor of Khan as this Court must do at the pleading stage, it may be inferred that Jara and Eldiasty were made aware of, and/or in a position to become aware of, the property that had been taken from Khan, including both the firearm and the valid license he had to concealed-carry that firearm. This, in turn, means that it can be inferred that Jara and Eldiasty were on notice that Khan had been arrested without probable cause and his firearm confiscated without lawful basis, and were in a position to intervene by halting the arrest processing and returning the firearm. They too may be held liable under Anderson, supra, and its progeny, and the allegations against them in the SAC are sufficient to state a plausible claim for relief at the pleading stage.

The third and final group consists of Astarita, who interacted with Khan during Khan's effort to obtain the return of his firearm. As to Astarita, the defendants make two arguments: (1) that because Astarita was not the final decision-maker in determining whether and when to return Khan's handgun, he did not commit a constitutional violation; and (2) that his actions were protected by qualified immunity. Neither argument suffices at the pleading stage of this action.

It is not necessary that a law enforcement officer be the final decision-maker in order to take part in committing a constitutional violation. In Section 1983 malicious prosecution claims, for instance, it is sufficient if a law enforcement officer is a moving force behind the prosecution of the plaintiff even if the final decision to prosecute is made by the District Attorney's office, and that conduct "such as giving advice and encouragement or importuning the authorities to act." Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010), or filing documents, see Cameron v. City of New York, 598 F.3d 60, 63 (2d Cir. 2010). Individual Second Amendment claims are relatively new – an individual constitutional right to bear arms was recognized only a

few years ago – but there is no reason why the same logic should not apply there. Even if Astarita did not have the final say, the SAC alleges that he explicitly told Khan that the firearm would not be returned until he, Astarita, was done investigating, and that it would be his recommendation that his supervisors acted upon. Astarita thus, at minimum, had the ability to remove an obstacle by recognizing that there was nothing to investigate and that there was never any reason to take Khan's weapon in the first place, wrapping up his "investigation" forthwith, and recommending to his supervisors that Khan's weapon be returned immediately. Accordingly, whether or not he was the final decisionmaker, the facts alleged in the SAC plausibly establish that he personally participated in and acted in furtherance of the complained-of Second Amendment violation.

Nor, in this case, can it be determined as a matter of law at the pleading stage that Astarita is entitled to qualified immunity. Notably, qualified immunity is an affirmative defense that the defendants have the burden of establishing. See Bailey v. City of New York, 79 F. Supp. 3d 424, 452 (E.D.N.Y. 2015). Qualified immunity exists as a matter of law only where "no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Id., citing Ashcroft v. al-Kidd, 563 U.S. 730, 735 (2011). Furthermore, where the issue of qualified immunity turns on disputed facts, "the factual questions must be resolved by the factfinder" rather than the courts. See Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007); see also Felmine v. City of New York, 2011 WL 4543268, *10 (E.D.N.Y. 2011) (denying summary judgment on qualified immunity grounds where the facts allegedly relied upon to establish probable cause were disputed).

In this case, there can be no doubt that when Khan was stopped, searched and arrested and his firearm was seized on November 26, 2023, the Supreme Court recognized an individual constitutional right to bear arms. See District of Columbia v. Heller, 554 U.S. 570 (2008);

McDonald v. City of Chicago, 561 U.S. 742 (2010); New York Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022).  This right extends "to all instruments that constitute bearable arms," and to both possession and carrying. See Heller, 554 U.S. at 581-84.  In Bruen, which was the most recent Supreme Court decision on the subject as of 2023, the Court also held that the Second Amendment operated as a direct restriction on the states' ability to restrict the use and carrying of firearms and that firearms may not be taken away simply because doing so would serve an important government interest. See Bruen, 142 S. Ct. at 2126.  Courts have held that right protected by these cases extends to arbitrary restrictions on concealed carry. See, e.g., Antonyuk v. James, 120 F.4[th] 941, 1044-47 (2d Cir. 2024) (affirming injunction upon a finding that it was likely unconstitutional to restrict licensed individuals from concealed-carrying in places open to the public).

In this case, the allegations of the SAC show that, as soon as his criminal case was dismissed, Khan informed Astarita both of the dismissal and the basis for the dismissal – namely, that the DA's office had validated his possession of an active unrestricted concealed carry license. Astarita may also be presumed to have known, from the paperwork in the case, that there was no other basis for Khan's arrest and/or for the seizure of his firearm.  Astarita thus knew, under clearly established law, that Khan had an individual, Second Amendment-protected right to possess and concealed-carry a firearm within all places open to the public, but nevertheless took steps to interfere with that right by delaying the return of Khan's firearm.  Moreover, to the extent that qualified immunity might turn on what information was given to Astarita and/or what knowledge he had from other sources, it cannot be determined as a matter of law pursuant to Zellner, supra. Therefore, as with the other individual defendants, the SAC states a plausible claim to relief against Astarita that cannot be defeated at the pleading stage.

**POINT V**

**AT MINIMUM, LEAVE TO REPLEAD ANY DISMISSED
CAUSES OF ACTION SHOULD BE GRANTED**

Finally, even if this Court finds that the SAC does not state a claim as to one or more causes of action and/or defendants – which, as set forth above, it should not – then it should at minimum grant leave to replead such claims. "When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Hayden v. County of Nassau, 180 F.3d 42, 53 (2d Cir. 1999). Moreover, it is appropriate to grant leave to replead to address "specific deficiencies" cited in a court ruling, and leave to replead should be denied only in cases of "futility, bad faith, undue delay, or undue prejudice to the opposing party." Jennings v. City of New York, 2023 WL 2307432, *2 (S.D.N.Y. 2023), citing Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., Ltd., 797 F.3d 160, 190 (2d Cir. 2015) and TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014).

In this case, which is at an early stage and where discovery is still in progress with several depositions yet to be taken, there would be no undie delay, nor would there be any conceivable prejudice if Khan were given an opportunity to amend his allegations. Nor, on this record, would amendment be futile or in bad faith. As depositions continue, the role that each of the defendant officers played in the arrest, processing, and incarceration of Khan, as well as the retention and displacement of his firearm, will be elucidated. It is highly likely that plaintiff will be able to plead additional and more specific facts concerning the conduct of each of these officers. Moreover, granting leave to replead will afford Khan an opportunity to investigate the Monell claim further, and to plead other instances of discriminatory treatment of lawful firearm owners of color in the event that this Court determines (as it should not) that there is a need for such instances to be

specifically pled, and/or to allege further customs and/or practices.[2]  Defendants do not argue in their motion that Khan *cannot* state these claims – instead, their argument is at most that, as yet, he *has* not.  Accordingly, to the extent that this Court dismisses any part of the SAC, which it should not, then any such dismissal should be without prejudice and with leave to replead.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, this Court should issue an Order denying the defendants' motion to dismiss to the extent opposed herein and granting such other and further relief to plaintiff as may appear just and proper.

Dated: February 18, 2025

/s/ Todd D. Greenberg
TODD D. GREENBERG

/s/ Jonathan I. Edelstein
JONATHAN I. EDELSTEIN

---

[2] For instance, Officer Astarita's deposition was recently held on February 13, 2025, and he testified in sum and substance that the City and NYPD made changes to their firearm policies and terminology in the wake of <u>Bruen</u> in order to protect the constitutional rights of concealed-carry licensees.  Based upon Officer Bessen's conduct as alleged in the SAC and as further testified to at his deposition, it appears that neither he nor any of the other officers at the scene of the stop/search/seizure/arrest were trained in these policies despite the clear risk that the absence of such training might lead to unlawful and unconstitutional arrests.  Plaintiff anticipates moving to amend his complaint to include detailed allegations concerning such failure to train, as well as such other and further policies, customs and/or practices as may be evidenced by further deposition testimony and discovery.