# EXHIBIT R



Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

RAFFIQUE N. KHAN,

      Plaintiff,

   v.               Case No.

NEW YORK CITY; ERIC L. ADAMS,   1:24-cv-02168-ARR-

Mayor, New York City, in his   JAM

official capacity; NEW YORK CITY

POLICE DEPARTMENT (NYPD); EDWARD

A. CABAN, Police Commissioner,

in his official capacity;

MICHAEL GERBER, Deputy

Commissioner of Legal Matters

(DCLM), in his official

capacity; Inspector ROHAN

GRIFFITH, Commanding Officer,

75th Precinct, in his official

capacity; NYPD Officer MATTHEW S.

BESSEN, Shield No 14934; NYPD

Officer NOAH NICHOLSON, Shield

No undisclosed by NYC at this

time; NYPD Sergeant PATRICK

HUGHES, Shield No undisclosed by

NYC at this time; NYPD Officer



JOSEPH JACOBSEN, Shield No undisclosed by NYC at this time; NYPD Officer THOMAS COSTIGAN, Shield No undisclosed by NYC at this time; NYPD Officer JEISON JARA, Shield No undisclosed by NYC at this time; NYPD Officer MOHAMED ELDIASTY, Shield No undisclosed by NYC at this time; and NYPD Officer JOSEPH ASTARITA, Shield No 6949; and NYPD EMPLOYEES JOHN AND JANE DOE NOS 1.10, of "DG_LIC-Incidents," "DG_LIC-Hearings-Appeals involved in refusing to return the firearm and magazine unlawfully seized from Raffique N. Khan and/or defacing said firearm and magazine,

Defendants.

_____

Page 29

M. BESSEN

look at your own body-worn camera in preparation of this deposition?

A    I did, sir.

Q    Did that ring a bell as to who that third person was?

A    I reviewed it several days ago and had a few arrests last night.  I was here until 5:00 a.m., so I'm a little -- a little tired.  But I -- there was another officer.  I don't -- I, honestly, don't recall who it was.

Q    As you were following Mr. Khan's vehicle, how far did you follow him before you initiated the car stop?

A    Several feet.

Q    Several feet?

A    Correct.

Q    And when you initiated a car stop, were you behind his car and was there another car in front, or you were the one who blocked him?

MR. VIVIANO:  Objection.

You can answer.

THE WITNESS:  I was behind him.

M. BESSEN

BY MR. GREENBERG:

Q    For the time that you had that car under observation to the time you stopped that car, did you see that those plates were issued to a Bronze and Purple Heart Medal winner, military?

A    No, I did not.

Q    You did not notice that?

A    No.

Q    Now what occurred when you initiated the stop?  Well, I'm sorry.

What do you mean to say when they -- when you say "I initiated the stop."

A    Oh.  I -- I activated my emergency lights.

Q    So did Mr. Khan pull over?

A    He stopped the vehicle.  He was in the -- it was a one-way street, so there was really nowhere to pull over. But he did stop.

Q    Before he stopped.  Did another police car -- how many police cars were with you and your car at that point?

Page 31

M. BESSEN

A    My car and one other.

Q    Okay.  Is the other car -- when you put on your lights and you pulled up behind and Mr. Khan stopped, where was that other car?

A    In front of him.

Q    And they pulled perpendicular in front of him to block his way?

MR. VIVIANO:  Objection.

You can answer.

THE WITNESS:  They pulled directly in front of him, front to front.

BY MR. GREENBERG:

Q    Front to front?  Okay.

Q    Correct.

Q    Now, do you know who was in that car?

A    Officer Jacobsen and Officer Costigan.

Q    So tell us what occurred when you initiated that stop.

A    We removed Mr. Khan and the occupants from the vehicle.  We went to the location where we were informed that

Page 32

M. BESSEN

the firearm was, recovered the firearm, and placed the defendants under arrest.

Q    And when you say the defendants, you placed Mr. Khan, the passenger, and the backseat passenger under arrest?

A    Correct.

Q    Did Mr. Khan say anything to you at that time?

MR. VIVIANO:  Objection.

You can answer.

THE WITNESS:  He informed me that he had paperwork and permits for his firearm. And I -- from what -- my recollection, that's about all he said.

BY MR. GREENBERG:

Q    Did he tell you he was a federal law enforcement officer?

MR. VIVIANO:  Objection as to the description of plaintiff -- or plaintiff being a federal law enforcement officer. It's not clear and the foundation is not led that he is one.

You can answer the question.

THE WITNESS:  He could have mentioned

Page 60

M. BESSEN

BY MR. GREENBERG:

Q    Okay.  So would it be fair to say that you prepared this report sometime prior or at 2:26 p.m. on November 26, 2023?

A    Yes.

Q    Now, when is the first time that you physically saw a carry license in the name of my client?

A    When I was searching the vehicle at the 75th Precinct station house.

Q    And where did you find that license?

A    I believe it was in the sun visor of the vehicle.

Q    And was it in his wallet?

A    I believe there was a separate carry permit.  He had -- I believe he had two on him.  But I believe the one I recovered was from the vehicle.

Q    What was the other one that you didn't -- well, withdrawn.

     Did you voucher any of the carry permits?

Page 61

M. BESSEN

A    I did.

Q    And if there were two, other than the one you vouchered, what's the other one?

A    I believe it was a residential carry permit.

Q    When you say you believe, are you sure?

A    Yes.

Q    The residential carry permit is what you refer to in the complaint. Correct?

A    No, sir.

Q    What?

A    No, sir.

Q    You do not refer to a residential permit in the complaint?

A    I would have to review the complaint, but I believe it was a -- it was referring to the vouchered permit.

Q    Okay.  I'll get back to that in a minute.  So in the voucher itself --

MR. GREENBERG:  Can you go up -- scroll up a little?

Page 62

M. BESSEN

BY MR. GREENBERG:

Q    What are you vouchering?

A    The physical permit.  Oh, no.
I'm sorry.  It does say two.

Q    What is it?

A    It says, quantity two.

Q    Yes.  Okay.  So what is
this -- well, let's read what you
vouchered.

A    I see it.

Q    You can read it out loud to us.
Well, I'll read it.  I'll save some time.
It says "Other IDs."  Correct?

A    Yes.

Q    Document Holder Name:  Khan,
Raffique.  Right?

A    Correct.

Q    Document Number CB2023005725.
Right?  I'm sorry.  Is that two, six?

MR. VIVIANO:  Objection.  I believe
it says two, six.

MR. GREENBERG:  Two, six.  I'm sorry.
It's my eyesight.

MR. VIVIANO:  We're in agreement.  I

Page 63

M. BESSEN

believe it says two, six.  Yeah.

BY MR. GREENBERG:

Q    And the issuer name is New York City Police Department.  Right?

A    Correct.

Q    And the description is a concealed carry permit.  Correct?

A    Correct.

Q    And on that sealed carry permit, did it not have the serial number of the gun that you took out of the glove box?

A    Yes.

Q    So when you saw and found that the man has a concealed carry permit for the gun that you arrested him for, what did you do?

A    I ran the permit through our -- records.

THE REPORTER:  Can you repeat -- yeah.  We ran permit through blank records?

THE WITNESS:  New York City, sorry.

THE REPORTER:  Thank you.

THE WITNESS:  Or NYPD Records.

Page 64

M. BESSEN

THE REPORTER:  And you were saying?

THE WITNESS:  I'm sorry?

BY MR. GREENBERG:

Q    Are you finished, Officer Benson?  I'm sorry.

A    No -- so we -- I ran the permit through NYPD records and then reviewed the return that I got from that search.  At which point it said "business carry."

Q    Did that come as a printed document for you?

A    It came in the form of a document on my phone that I later printed.

Q    And do you have that?

A    I believe it is in the exhibits I was provided.  I don't have it.

Q    Is that Exhibit 8, or is that something called Firearm - License and Permits?

A    I would have to see Exhibit 8, sir.  I'm sorry.  I don't --

Q    Okay.  I'll get to that in a minute.  I don't want to get too far ahead of myself here.

Page 65

M. BESSEN

When you saw that permit, did you say anything to Mr. Khan?

A    No.  I believe I was in the office.

Q    Did you ever have a conversation with Mr. Khan and say to him "How did you get a carry permit?"

A    I don't recall that conversation independently, no.

Q    And did you ever say to him -- well, withdrawn before I get to that.

What's the second document that's not on this voucher that you apparently say you vouchered?

A    I believe it was in the exhibits.  I'd have to see those.  It would be the same -- it would be the same document that's -- that's vouchered.  He might have had two of them.

Q    In other words, it was a duplicate of the carry permit?

A    It -- it -- again, it could be. I believe the exhibits have the pictures

Page 66

M. BESSEN

included.

Q    Exhibit that you saw, numbered 1 to 14, or are you talking about something else?

A    No.  I believe those exhibits, numbered 1 to 14.

Q    And you saw a picture of it?

A    Yes.

Q    Do you have any recollection of what that ID was or what it was?

A    It was a concealed carry permit.

Q    I'm sorry.  Let me say this again.  Oh, hold on.  Hold on.  I know what you're referring to.  I apologize. May I have a second?

MR. GREENBERG:  Can you put up on the screen Number 7, Exhibit Number 7?

(Plaintiff Exhibit 7 was marked for identification.)

THE REPORTER:  There you go, sir.

MR. GREENBERG:  Thank you.

BY MR. GREENBERG:

Q    I'm showing you what's been marked as Exhibit 7.  Do you see any of

Page 67

M. BESSEN

the other documents that you say --

MR. GREENBERG:  And there's -- I think there's another document on the bottom of that too, Madam Reporter.

BY MR. GREENBERG:

Q    Are any of those documents the document that you also vouchered under the voucher that I just showed you, Exhibit 5?

A    Yes -- that the red one under the license -- under the driver's license.

Q    So that's the concealed license permit?

A    Correct.

Q    Okay.  And that's what you vouchered?

A    Correct.

Q    So when the voucher says Item 1, quantity two, was that a mistake or was there another document?

A    I believe there would be another document.  I -- I would have to see the physical voucher to see what's actually in the bag.  But if it says that there's two, then there was two.  One might've been old

Page 68

M. BESSEN

and expired.

Q    When you saw and found the concealed carry handgun permit, did you speak to any of your supervising officers here?

A    Yes.

Q    -- the man has a permit?

A    Yes.

Q    Who'd you speak with?

A    Sergeant Hughes.

Q    And what did Sergeant Hughes say -- or what did you say to Sergeant Hughes and what did he say to you?

A    In sum and substance, I said he has a concealed carry handgun license. However, with the records check, it is a business carry only permit as per NYPD records. And Sergeant Hughes in sum and substance said that we're going to contact NYPD Legal.

Q    And what happened?  Did anybody contact NYPD Legal?

A    Yes.  I did.

Q    Okay.  And tell us what the

Page 69

M. BESSEN

conversation was and who you spoke with, if you remember. Well, before you get to that, did you make any notes of that conversation?

A    No.

Q    Do you know who you spoke with?

A    It was a sergeant from the Intelligence Bureau, NYPD Legal.

Q    Do you have a name or a phone number?

A    I -- I do not.

Q    And what did you say to that person?

A    In sum and substance, I explained the situation that he -- that Raffique Khan has a concealed carry permit. It's a business carry only. He -- the sergeant from intelligence asked me this -- you know, to explain the situation. I did. And he advised me to charge Raffique Khan with a permit violation misdemeanor.

Q    Now I want to show you what's been marked as Exhibit 8.